# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for First United Bank, | |
| Plaintiff, | No. 14 C 64 <br> Judge James B. Zagel |
| v. | |
| ILLINOIS NEUROSPINE INSTITUTE, P.C., an Illinois corporation, and RONALD MICHAEL, an individual, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This dispute originated in 2006 when Dr. Michael borrowed money from First United Bank. His purpose was to infuse capital into Arcola Homestead Savings Bank, in which Dr. Michael had an ownership interest.[1] The expectation was that Arcola would have revenue from its banking efforts and this revenue would allow him to pay down his loan from the First United Bank. After the loan was made, the commerce of the United States started to go south. By 2008, the economic difficulties, generally speaking, were clearly patent and widespread. One consequence of the recession was the revaluation of security posted or promised for outstanding loans. The FDIC required Arcola to write down loans it deemed "iffy," and when Arcola loans were found questionable, Arcola was rendered undercapitalized.

I note that Dr. Michael asserted that he did make some effort to recapitalize Arcola. He testified that "One of our directors was a partner of a 2-billion-dollar fund out of St. Louis. He resigned from the board [*of Arcola*] to be able to pursue a purchase of the bank. He ultimately

---

[1] Dr. Michael had an ownership interest in the Neurospine Institute which was connected to his medical practice. The institute itself was and is a co-borrower on the loan from First United.

came through with a 5 million-dollar letter of intent to purchase the stock of Arcola…" The problem was that the conditions to infuse this capital included two other conditions. One was that First United had to release the stock of Arcola back to Dr. Michael. That stock was collateral for First United so that Dr. Michael could sell that collateral to First United before adding capital.

Defendants assert that Arcola found an investor willing to put further capital into Arcola, but that the FDIC and First United "frustrated Arcola's efforts to recapitalize the bank and avoid receivership." This may be so but the FDIC has both power and responsibility for the governance of banks like Arcola and First United, and particularly to protect the customers of failing banks. The FDIC has discretion to assume control of a bank to protect depositors. It may give leeway to banks that appear to be better suited to survive. The FDIC may make the wrong call. By law it is given discretion which means it will, from time to time, choose the wrong path as well as the right path. Although Dr. Michael did understand that First United had the authority to say no to the release of collateral, Dr. Michael said it was not foreseeable (at least to him) that First United would refuse to release the collateral or that the FDIC would reject the capital infusion. Dr. Michael believed that his plan would have been a prudent business decision. It is fair to conclude that neither First United nor the FDIC shared that conviction. Federal regulators put Arcola into receivership; its stock lost whatever value it had. First United declared Dr. Michael in default under the loan.

What Dr. Michael did or did not do about this is important. His default, he contends, resulted from "an unforeseen economic crisis and a corresponding, unanticipated change in the regulatory environment." Mostly, in this case, it is what he did not do that is concerning. For example, Dr. Michael contends that he never received letters giving notice of default. I accept that one letter apparently was sent to an address that he had moved from two decades earlier. Dr.

Michael was, however, cognizant of a notice of default because he agreed that the receiver's collection agent sent an email notice of default which Dr. Michael received. The doctor believed the email concerned another loan he had with Advantage Capital and not First United Bank. There was a follow-up email on the default at issue here, but the doctor does not remember receiving it. The email did identify the role the receiver "plays in your defaulted loan/forbearance agreement between you and First United." The doctor testified that "it made no sense to me." He inferred that Advantage Capital knew all about the various loans and that is where the matter ended for him. It took the doctor several weeks to hire counsel to seek the vacating of default; this even after the time he admits he became aware of the specific issue of First United.[2]

This example clearly states Dr. Michael's position: "I would've called them…It would've been prudent of me" if he had received the default notice. He would have "hired counsel and begun to do what we could to bring…a settlement." There were negotiations regarding the status of loans. They did not reach quick conclusions. The back and forth and the thinking done by the doctor "chewed up the 5 months at which time the bank ran out of time." When the bank was seized in September 2012, the doctor was not trying to get in touch with the receiver. The receiver generally reached out to the doctor; the doctor did not reach out first. It was at this time that the doctor received a communication and wrongly assumed that the receiver's email did not relate to his defaulted loan/forbearance agreement between him and First United.

The doctor was asked if he understood when he made the loan to First United that if the loan to First United matured and was unpaid, he would have to pay it. His response was this: "My assumption [when he entered into the loan] was, it would be basically renewed, as loans

---

[2] The motion to defeat the default order was filed five months after entry of default and one month after knowing of the citation to discover assets.

are." This was part of a trail of assumptions. After the seizure of the bank, the doctor said "I assumed eventually they would reach out to me and we would resume those sorts of discussions about a reasonable settlement that I could do something about." He testified that he was "waiting…I knew that time passes as the receiver, be it a new bank or the FDIC itself, gets their arms around what they have just seized and begins to systematically reach out to those borrowers to come to some term of settlement…I did not reach out, but I had never reached out. It was always them reaching out to me and me responding in kind." He concedes that he had no way to pay off the debt entirely. The doctor's mantra was that he could provide a "settlement." Finally, Dr. Michael called the FDIC's lawyer after "I really found out about this lawsuit." In response to the FDIC's lawyer's aggressive tone, he said he would get a lawyer. He "then took [his] time to eventually find counsel." He did find counsel four months or so after the default judgment was entered.

Dr. Michael's unusual understanding of the rules and standards applicable to collateral is that the right to foreclose on the collateral when the loan is unpaid may not be the right of the lender. During cross-examination he said:

> "It has never been my understanding that irrespective of any change in the financial environment that parties will remain committed to an agreement that may be difficult to enforce or to affect. In other words, the prudent businessman will flexibly modify his expectations in the event of the dramatic and catastrophic changes that our financial health care system experienced. So yes, they may have had these rights, but prudence would've dictated that they would've become flexible and resourceful enough to try to do the best they could in a very bad situation. But to remain rigid and insist on things that they felt had a right to but they couldn't possibly ever collect upon would be irresponsible on their part if they wanted to get their payments."

The FDIC is not a businessman. If anything ought to have motivated the doctor's careful and prompt attention to the status of his own business and finances, it would be his understanding of these facts. But he did, I think, understand that the FDIC is not a businessman,

which is why he sought legal counsel. When he was dealing with other businessmen who did not have the power to compel his conduct, he could hope for a settlement. And, hopefully, find new unconstrained capital at a reasonable cost.

After dealing for some time with the loan, the FDIC and Dr. Michael did enter a forbearance agreement. There was a negotiation over the agreement. As is commonly the case, the doctor recognized that he "didn't have the leverage to insist on too many changes." He was under pressure but did remove his medical practice as a guarantor of the loan. He agreed to keep his life insurance in place when the FDIC insisted on this point. At the hearing, Dr. Michael was confronted with the agreement's boldface print stating that the borrower agrees "to not contest the entry of said judgment" and the doctor conceded that he, himself, was the borrower. He also accepted the fact that the agreement empowered the lender to file a lawsuit against the borrower for the purpose of having a court enter judgment in favor of the lender against the doctor-borrower. After conceding the existence of the language, Dr. Michael said he did not agree to accede to entry of judgment. He seems now to say that he was protected under the terms of prior documents. He simply says that he did not understand the clear language that the lender had the absolute right to judicial entry of judgment against the borrower.

There is no escape clause for the doctor. The fact that he may have signed the agreement under a mistaken understanding does not eradicate the absolute right given to the lender. There is no claim that the language was unclear. He believes that after signing the forbearance agreement he would have "whatever rights that any borrower would have." How he could conclude this to be the case is difficult to comprehend since the language of the agreement clearly surrenders rights since it allows the lender to enter judgment whether or not the borrower objects. In his testimony there is a hint of an explanation for his "understanding" of his rights: "I wasn't doing

5

well enough to spend an extra 10- or 20,000 dollars for an attorney to review documents and to go back and forth with various versions."

I do not find this to be credible. The price of a lawyer to review a routine forbearance agreement does not approach the price cited by the doctor. Frankly, I do not believe that the doctor had any desire for a lawyer's opinion no matter how low the price might be. What Dr. Michael wanted was a businessman's negotiated and agreed resolution wherein the doctor reduces his debt and goes forward with his banking. The FDIC has the legal authority to pursue the legal remedy and not the business negotiation, and I believe the doctor knew it. The doctor, understandably, wanted to put off the final judgment. In the end, he made this even clearer when he sought to avoid service in this case.[3] He cannot obtain relief under Rule 60(b)(1) on the ground that his neglect was excusable. It was not. There were no good grounds to vacate a default judgment in the first place and no prompt action to correct it. *Jones v. Phipps,* 39 F.3d 158, 162 (7th Cir. 1994).

The defense has offered meritorious defenses which can be an element supporting a claim to justify excusable default. An honest belief of Dr. Michael that he had the right to insist on business negotiations rather than judicial enforcement does not save his day. There was a Change in Terms Agreement ("CITA") signed fairly late in the process. The CITA might well release the Neurospine Institute from its duties with respect to First United. The consideration for this release was not cited in the document, it was an undocumented side agreement and the consideration was tendered to First United years before the bank released the Neurospine Institute. The side agreement is against the provisions of 12 U.S.C. §1823(e). In any event, the thing of value to be given to First United was, according to Dr. Michael, the benefit that "one

---

[3] Dr. Michael refused to identify himself when confronted by the process server and refused to accept the server's papers and told his staff not to accept documents for him.

6

day [First United] gets paid off by me." I do agree that under extraordinary circumstances the understandings might serve as consideration, but this is, at best, a very weak claim.

Another claim of meritorious defense is the claim that a contract may not be enforceable. An unforeseeable circumstance that makes it impossible to perform the agreement or radically changes the nature of the intended performance will annihilate the legal force of the contract. The difficulty for Dr. Michael is that the Forbearance Contract does not excuse the failure to pay off the loan. There were defenses that the doctor did have when Arcola closed. But these defenses arose before the forbearance contract was signed and, at the time of signing, those defenses were lost. In any event, there were no unforeseeable circumstances or radical changes in the business here. Banks fail in America every year, loans are foreclosed upon every year, owners lose their bank stocks and serious and national economic declines are a feature of large economies. These factors destroy companies and enterprises unless a government chooses to save them. There is nothing novel here. In this case, Dr. Michael might have done better if First United had released its collateral, but First United had no duty or obligation to do so and the doctor knew it.

I do note that Dr. Michael's conduct was unwise, dilatory, and careless in his dealings with his own bank and First United, but I do not believe he crossed a more serious line. I think he did think he could insist on his unfortunate belief that banking was just another business like any other, rather than an enterprise subject to state and federal rules and mandates and government agency controls. I think, too, that he believed it was his right to delay, as long as he could, in the hope that the economy would turn or some investor-savior would save his bank. His tool was avoidance and going slow, hoping that he could hold off the FDIC. It was a bad choice and reflective of his shortcomings and unwillingness to seek the assistance of lawyers. I doubt he will

return to banking. The quotation offered by the FDIC is on point here: "Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won." *United States v. Golden Elevator,* 27 F.3d 301 (7th Cir. 1994).

The defendant's motion to vacate default judgment is denied.

ENTER:

James B. Zagel
United States District Judge

DATE: June 18, 2015